IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

              v.                                          25-CR-31-JLS

ANDRES J. PIZARRO CAMPOS a/k/a Kiki, et al.,

              Defendant.

_____

## GOVERNMENT'S REPLY TO THE DEFENDANTS' RESPONSE

The United States of America by and through its attorney, Michael DiGiacomo, United States Attorney for the Western District of New York, and Joshua A. Violanti, Assistant United States Attorney, hereby files the government's reply to the defendants' response to the government's motion for a protective order, Dkts. 69, 70, 71, 72, 73.

## INTRODUCTION

A grand jury in this district has charged the Defendants with a large drug-trafficking conspiracy operating out of Jamestown, New York. The government seeks a protective order to protect the integrity of the ongoing investigation, witnesses, individuals cooperating with the government, and the privacy interests of others.

## PROCEDUAL BACKGROUND

On February 18, 2025, a federal grand jury returned a four count Indictment against nine defendants for violations of Title 21, United States Code, Sections 841(a)(1), 846, and 856(a)(1); and Title 18, United States Code, Sections 924(c)(1)(A)(i), 1503, and 2. Dkt. 1.

The government notified most, if not all of defense counsel in this matter of its desire to file a protective order in this case and provide extensive discovery materials including Jencks and witness statements to facilitate to this matter towards resolution or trial. Some defense counsels were provided a copy of the version of the proposed protective order at arraignment.

On February 26, 2025, the government provided an initial draft of a protective order. Discussions with defense counsel from this case and another related case were then jointly conducted. On March 14, 2025, the government and a contingent of defense counsel met over Webex and discussed the proposed protective order. The government requested proposed suggestions from defense counsel. The government received suggested revisions from Attorney Yellen on March 21, 2025. Subsequently, Attorney Grabalski agreed with Attorney Yellen's suggestions. Then, Attorney Foti suggested a small revision. Attorney Okay also concurred with others' suggestions.

After receiving some defense counsel suggestions, the government reviewed the proposed protective order. The government identified language in Attorney Yellen's example protective order, that the government believed to be helpful to its stated purpose. The government reviewed and accepted some revisions but also added additional language. On March 24, 2025, the government submitted a proposed protective order incorporating some agreed upon proposed suggestions and additional language. The government did not receive a substantive response.

On March 28, 2025, the government submitted a further proposed version. The government did not receive a substantive response. The government does not fault defense counsel for not responding. Because the government was cognizant of its upcoming obligations under the Court's discovery deadline, on April 9, 2025, the government filed a motion for a protective order. Dkt. 61. No defense counsel consented to the exact terms of the proposed protective order.

On April 18, 2025, defendant-Jaquez Thomas filed a response in opposition to the government's motion for a protective order. Dkt. 69, 70. On April 18, 2025, defendant-Max Pizzaro Campos filed a response in opposition to the government's motion for a protective order. Dkt. 71. On April 18, 2025, defendant-Edward E. Leeper Jr. filed a response in opposition to the government's motion for a protective order. Dkt. 72. After the Court's deadline of April 18, 2025, defendant-Cindy Frank filed a response in opposition to the government's motion for a protective order. Dkt. 72. On April 21, 2025, defendant-Joseph Thayer filed a response in opposition to the government's motion for a protective order. Dkt. 73.

On April 25, 2025, the parties conferred over a video conference. Some agreement was made, but the parties agreed the motion hearing was still necessary to address the protective order.

Based on the discussion during the conference, on March 26, 2025, the government submitted a revised Protective Order to defense counsel, and asked for comments and suggestions from defense counsel.  Gov't Ex. A

Mr. Gabalski (counsel for Thomas) responded that his only suggestion would be regarding the first full paragraph of page four -- that the attorney's eyes-only language be struck, as the latter half of the paragraph specifies that counsel can only disclose the information to Authorized members of the Defense Team.

Mr. Foti responded that he had an additional concern grading the provision that read "Defense Counsel shall return all Protected Discovery Materials, or confirm destruction of the foregoing materials by letter to the government."  Mr. Foti requested that the language should include the phrase "upon written request by the government."

Mr. Roberts (counsel for Frank), Mr. Yellen (counsel for Max Pizzaro Campos) and Mr. Okay (counsel for Thayer) concurred with other counsels' comments.

It is the government's understanding that the responding counsel are seeking to maintain the date for the motion hearing on the protective order set for May 8, 2025.  The government joins in that request.

The government sets forth its reply herein.  In addition, pursuant to Rule 16(d), the government is submitting an *ex parte* memorandum to support its motion for a protective order.[1]

## ARGUMENT

### A. Standard

"Good cause justifying a protective order exists only when a party shows that disclosure will result in a clearly defined, specific, and serious injury. A finding of harm must be based on a particular factual demonstration of potential harm, not on conclusory statements." *United States v. Hall*, 2021 WL 6122951, at n.1 & *1 (S.D.N.Y. Dec. 14, 2021) (internal quotation marks and citations omitted). In other words, a "party can demonstrate good cause for the issuance of a protective order 'when a party shows that disclosure will result in a clearly defined, specific and serious injury'—such as compromising the 'privacy interests of innocent third parties,' causing a risk of harm to law enforcement or others, or 'imped[ing] ongoing [government] investigations.'" *United States v. Jackson*, 2022 WL 582700, at *2 (S.D.N.Y. Feb. 25, 2022) (quoting *United States v. Smith*, 985 F. Supp. 2d 506, 523-24, 530 522 (S.D.N.Y. 2013) (citations and quotations omitted)); *see also United States v. Ramirez*, 2021 WL 914457, at *1 (S.D.N.Y. Mar. 10, 2021) ("The good cause standard requires courts to balance several interests, including whether dissemination of the discovery materials inflicts hazard to others [and] whether imposition of the protective order would prejudice the

---

[1] Rule 16(d)(1) expressly permits the government to demonstrate good cause to deny, restrict or defer discovery based on an ex parte submission. Rule 16(d)(1), Fed.R.Crim.P. ("At any time the court may, for good cause, deny, restrict, or defer discovery or inspection, or grant other appropriate relief. The court may permit a party to show good cause by a written statement that the court will inspect ex parte."). *See also United States v. Lee*, 374 F.3d 637, 652 (8th Cir. 2004) ("a district court may for good cause limit a defendant's discovery based on an ex parte written statement").

defendant.") (internal quotation marks and citation omitted); *see also United States v. Urena*, 989 F. Supp. 2d 253, 262 (S.D.N.Y. 2013) (noting that generally courts enter Rule 16 protective orders as a "means of protecting witness identity," and that courts should take into account "the safety of witnesses and others, [or] a particular danger of ... witness intimidation") (citations omitted). A finding of harm "must be based on a particular factual demonstration of potential harm, not on conclusory statements." *United States v. Gangi*, 1998 WL 226196, at *2 (S.D.N.Y. May 4, 1998) (citation omitted).

As the Supreme Court has explained, "the trial court can and should, where appropriate, place a defendant and his counsel under enforceable orders against unwarranted disclosure of the materials which they may be entitled to inspect." *Alderman v. United States*, 394 U.S. 165, 185 (1969).

Generally, courts regularly authorize discovery restrictions, despite inconvenience to defense counsel or the defendant. *See, e.g., United States v. Rivera*, 153 F. App'x 758, 760 (2d Cir. 2005) (holding district court's protective order did not deprive the defendant's right to effective assistance of counsel where the order prohibited the defendant from retaining Jencks Act material at his facility because the defendant was given ample opportunity to review and consult his lawyer); *United States v. Navarro*, 770 F. App'x 64, 65 (4th Cir. 2019) (rejecting defendant's argument that protective order "unduly impeded [defendant's] ability to review the evidence against him" where protective order required that certain discovery materials remain in defense counsel's office or personal custody); *United States v. Johnson*, 191 F. Supp. 3d 363, 374 (M.D. Pa. 2016) ("[G]iven the sensitive nature of the covered documents,

6

Defendants' 'just trust us' approach is simply inadequate as a matter of law.") ("[R]equiring the Defendants to review the protected documents in the presence of counsel in no way impairs the effectiveness of their proffered defenses.").

Courts have imposed reasonable limitations on discovery even in cases where defendants chose to represent themselves—which present greater concerns for a defendants' ability to review discovery than in this case, where the defendants are represented by skilled and able counsel. *See, e.g., United States v. Galloway*, 749 F.3d 238, 242 (4th Cir. 2014) (upholding court's ruling that *pro se* defendant could not take any discovery materials to the detention center including any handwritten notes he made regarding reviewed discovery).

**B. The government's protective order is supported by good cause and then some.**

The government's proposed protective order limiting the dissemination of discovery material is supported by good cause at least because it protects the integrity of an ongoing investigation, the safety and identity of confidential informants and/or cooperating witnesses, and the privacy interests of third parties. The proposed protective order is not a blanket, nonspecific protective order. The government intends to produce voluminous discovery materials, including documents well beyond the contours of Rule 16, arising from a complex and long-standing investigation involving numerous defendants, cooperating witnesses, and law enforcement actions. Some of these materials would be protected in the form of attorney's eyes only or attorney retention while others are not protected.

These protections will "facilitate speedy disclosure" of materials to the defense. *United States v. McCaughey*, 534 F. Supp. 3d 132, 141 (D.D.C. 2021). "[I]n a case which involves substantial amounts of discovery," such as this one, "it is consistent with the proper allocation of evidentiary burdens for the Court to construct a broad ... protective order upon a threshold showing by the Government of good cause." *Smith*, 985 F. Supp. 2d at 546 (cleaned up) (collecting cases); *see also United States v. McCaughey*, 534 F. Supp. 3d 132, 140–41 (D.D.C. 2021).

The proposed order will not significantly prejudice the defendants. The defendant will "remain[] free to object to the designation of certain documents as sensitive or to seek modification of the proposed protective order at any time." *McCaughey*, 534 F. Supp. 3d at 141. *See also Smith*, 985 F. Supp. 2d at 546 ("None of this means that Defendants will not be able to challenge the designation of certain documents, or otherwise request a modification of the Protective Order should circumstances change."). Further, "requiring defense counsel to screenshare sensitive information rather than provide copies for [the defendant] to review on his own hardly amounts to material prejudice." *See United States v. Fortenberry*, 2024 WL 3202271, at *3 (D.D.C. June 27, 2024); *United States v. Cudd*, 534 F. Supp. 3d 48, 55 (D.D.C. 2021) (protective order's limitation on defendant's "ability to have unfettered access to some discovery" not prejudicial). For the reasons described below, the government's proposed order is reasonable and supported by good cause.

### 1. Ongoing investigation

This matter centers around drug trafficking around Jamestown, NY spanning nearly 5 years – multiple defendants, witnesses, and locations such as Buffalo, NY; Rochester, NY; and Binghamton, NY.  The case has underpinning in multiple cases within in this district including *United States v. Joseph Zaso*, 22-CR-74-LJV; *United States v. Douglas Beardsley*, 19-CR-133-A; and *United States v. Rocco A. Beardsley*, 20-CR-100-A/JLS.

From about September 2018 to May 2022, Joseph Zaso sold sizeable quantities of fentanyl, heroin, cocaine, and methamphetamine in and around the Jamestown, New York area. Zaso had several sources of supply. Zaso had partners. Zaso utilized a series of mid to low-level dealers and runners to effectuate his operation. This prosecution and related investigation are complex and interwoven.

The government's production may allow the defendant and others to share materials to put together the government's past and ongoing investigations. *Cf. United States v. Amodeo*, 71 F.3d 1044, 1050 (2d Cir. 1995) ("Officials with law enforcement responsibilities may be heavily reliant upon the voluntary cooperation of persons who may want or need confidentiality. If that confidentiality cannot be assured, cooperation will not be forthcoming.").

The government's *ex parte* submission will further address the extent of the related prosecutions and ongoing investigation.  Nevertheless, it is axiomatic that appropriate

guardrails are needed to protect the government investigation and related prosecutions – its witnesses, potential targets, investigative techniques, etc.

As previously indicated, the government seeks to disclose certain materials including certain redacted Jencks materials, witness statements, search warrant affidavits, certain police reports, recordings, certain cellphone records, certain financial records, certain Facebook account records pertaining to communications with associates, co-conspirators, and potential witnesses, and search warrants relevant to the charges in the Indictment.

"Disclosure of these documents might reveal investigatory tactics and might also discourage potential cooperators in ongoing or future Government investigations." *United States v. Kerik*, 2014 WL 12710346, at *2 (S.D.N.Y. July 23, 2014). "[W]here public disclosure of certain materials might officially reveal the sources and methods law-enforcement officials have used, and will continue to use, to investigate other criminal conduct related to the publicly filed charges, courts have found it appropriate to enter a protective order." *Smith*, 985 F. Supp. 2d at 531; *see also United States v. Bin Laden*, 2001 WL 66393, at *2 (S.D.N.Y. Jan. 25, 2001) (noting that the protected order was adopted because of the "serious risk that unauthorized disclosure of classified information would jeopardize the ongoing Government investigation into the activities of alleged associates of the Defendants"). "This information, should it become publicly available, could alert the targets of the investigation and could lead to efforts by them to frustrate the ongoing investigations." *Smith*, 985 F. Supp. 2d at 532.

The government believes the ongoing nature and complexity of this prosecution and investigation demonstrates that there is good cause for a protective order "because of its compelling interest in ongoing investigations into potentially serious criminal conduct that could be jeopardized by dissemination of the discovery." *Id.* at 545-46. "This interest does not involve a single criminal episode, nor does it derive from a single page, or even a handful of pages, from the discovery materials. Rather, the interest is in several investigations that cover different targets, different crimes, and different time periods." *Smith*, 985 F. Supp. 2d at 545–46. Furthermore, public disclosure of investigative materials, directions, and techniques would significantly undermine the government's ability to use these techniques as well as impede ongoing and future investigations. The defendants' arguments opposing this provision are unavailing given the countervailing governmental need to protect ongoing and future investigations.

### 2.  Risk of harm to others

The unfettered disclosure of the materials in this case "would pose a hazard to others." *See United States v. Dixon*, 355 F. Supp. 3d 1, 4 (D.D.C. 2019). Some of the discovery materials include witness statements, references to witnesses and their statements, financial documents, phone numbers and analysis, results of searches performed upon other individuals' devices and accounts. The government's harm here is specific and concrete: permitting defendants to possess sensitive and cooperator material implicates the privacy interests of identified individuals who are either witnesses or uncharged subjects or targets of the investigation.

As the Court is aware, this is a narcotics conspiracy case centered in and around Jamestown, New York area, where the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great, publication of the exhibits should not occur. *Cf. United States v. Morales*, 1993 WL 465209, at *11 (S.D.N.Y. Nov. 9, 1993) (noting in a matter concerning disclosure of the government's witness list, "The Government's interest in this balancing test assumes special weight where, as here, the case involves narcotics charges, numerous firearms, and defendants who live near each other and know each other's families."); *see also United States v. LaFontaine*, 210 F.3d 125, 135 (2d Cir. 2000) (in a bail detention matter noting, "[a]lthough witness tampering that is accomplished by means of violence may seem more egregious, the harm to the integrity of the trial is the same no matter which form the tampering takes.").

The circumstances of the charged offenses in the indictment are substantial and serious. The defendants played various roles in a long running narcotics conspiracy with Jospeh Zaso, a significant Jamestown, NY and Buffalo, NY drug trafficker.

From about early 2018 to 2022, Joseph Zaso and his associates distributed quantities of fentanyl/heroin and cocaine. Zaso distributed amounts of those drugs from the defendant – totaling kilogram quantities. Thus, "[t]his offense involves a substantial quantity of drugs*," United States v. Kouchekzadeh*, 2008 WL 1902434, at *2 (W.D.N.Y. Apr. 28, 2008), since Zaso was accountable for kilogram quantities of heroin/fentanyl and cocaine, which he distributed to others. These types of large-scale criminal enterprises, involving large amounts of dangerous drugs, are the type that pose considerable danger to the community.

Fentanyl and heroin are "lethal narcotics that are destroying communities and causing overdose deaths." *United States v. Mendez*, 2020 WL 3263446, at *4 (W.D.N.Y. June 17, 2020), *aff'd*, No. 20-2066, 2020 WL 5814214 (2d Cir. Sept. 23, 2020) (discussing heroin, fentanyl, and acetyl fentanyl); *see also United States v. Zaso*, 2022 WL 4077675, at *2 (W.D.N.Y. Sept. 6, 2022), *aff'd*, 2022 WL 17741537 (2d Cir. Oct. 31, 2022). "Although not in and of themselves a crime of violence, the harm being caused by the distribution of these drugs can be more dangerous than some crimes that are categorized as crimes of violence." *Mendez*, 2020 WL 3263446, at *4. Furthermore, the sheer quantity of drugs trafficked by the defendant as well as the Zaso organization and the defendant's role demonstrates the exceptionally serious nature of the offense. *See United States v. Brown*, 2017 WL 4883375, at *3 (W.D. Pa. Oct. 30, 2017) (unpublished) ("The court is mindful that the distribution of fentanyl, in particular, has recently resulted in serious harm to the community ..."). "[T]here is an inherent violence and danger that accompanies the cocaine trade and that disclosure of an informant's identity exposes them to the 'real potential of retaliation at the hands of cocaine traffickers.'" *United States v. Holland*, 41 F. Supp. 3d 82, 103 (D.D.C. 2014) (citation omitted).

The close-knit nature of the Jamestown, NY makes dissemination particularly problematic. During the pendency of law enforcement's investigation into Jamestown, NY based drug trafficking, evidence of individuals passing of news articles and judicial documents, via social media has been discovered.

The government's concern for witness safety is particularly acute when a defendant has access to physical documents that may be "passed from hand to hand within the prisons"

or within the communities of Jamestown, NY; Buffalo, NY; and Rochester, NY. *See United States v.* Garcia, 406 F. Supp. 2d 304, 306 (S.D.N.Y. 2005); *see also United States v. Palmer*, 2011 WL 672412, at *1 (S.D.N.Y. Feb. 14, 2011) ("[Jencks material] is often copied, passed around prisons throughout the country, and used to retaliate against cooperators.") (internal quotation marks and citations omitted); *United States v. Scott*, 2008 WL 4372814, at *2 (M.D. Pa. 2008) ("While the Defendant has been permitted to review the contents of the [] witness statements . . ., turning over hard evidence of witness cooperation risks facilitating witness intimidation."); *United States v. Barbeito*, 2009 WL 3645063, at *1 (S.D.W. Va. Oct. 30, 2009*)* (noting that dangers to witness safety are "certainly compounded when written discovery materials identifying informants are floating about in the community, and perhaps worse yet, on the internet").

For example, recently, the government dealt with the unauthorized release of Jencks materials pertaining to a potential trial witness in the Jamestown, New York area. The materials were discovered in a drug house after a search warrant execution. The government investigated and became aware of the dissemination of certain material and information covered by the protective order in *United States v. Luis Martinez*, 21-CR-89-JLS. Further, based on additional investigation, law enforcement found evidence indicating that the Luis Martinez had attempted to contact a potential witness in the government's case—an individual whose information was subject to the protective order. The sharing of Protected Discovery Materials in jails and the community at large creates a very potential harm to cooperating witnesses and potential witnesses.

14

### 3.  Voluntary Production of Materials

18 U.S.C. § 3500 "provides that no prior statement made by a government witness shall be the subject of discovery until that witness has testified on direct examination." *United States v. Coppa*, 267 F.3d 132, 145 (2d Cir. 2001).  The government is not legally required to produce such statements "until after each witness testifies." *Garcia*, 406 F. Supp. 2d at 306-07. Jencks material "is ultimately provided for a limited purpose," and generally, "[d]efendants are not given such material to facilitate general trial preparation or as a form of pre-trial discovery." *Id.* at 306 (noting that "there is no vested right for such material to be provided in a form or under rules that facilitate leisurely review of the material by defendants"). Typically, as is customary in this District, counsel for the defendant is provided with 18 U.S.C. § 3500 material approximately 30 days before trial. A date for trial is not set yet.

Rule 16(a)(2) excludes from the government's discovery obligations "Except as permitted by Rule 16(a)(1)(A)-(D), (F), and (G), this rule does not authorize the discovery or inspection of reports, memoranda, or other internal government documents made by an attorney for the government or other government agent in connection with investigating or prosecuting the case." Rule 16(a)(2)'s scope is broad and includes federal law enforcement reports and related local police reports, among other documents. *See United States v. Savoca*, 2004 WL 1179312, at *2 n.6 (S.D.N.Y. 2004) (collecting cases).

While the government is not required to produce Rule 16(a)(2) materials and not required to produce Jencks materials and statements until after each witness testifies, it may

"hamper defense counsel's preparation and interfere with the efficient administration of justice." *Garcia*, 406 F. Supp. 2d at 306. "[A]s a matter of case management, courts frequently encourage the government to produce Jencks Act material prior to trial." *United States v. Rodriguez*, 2020 WL 5819503, at *11 (S.D.N.Y. Sept. 30, 2020) (citing *United States v. Stein*, 424 F. Supp. 2d 720, 728 (S.D.N.Y. 2006))); *United States v. Wilson*, 2017 WL 1456984, at *4 (W.D.N.Y. Apr. 24, 2017) ("The [g]overnment is encouraged to begin providing 3500 material as soon as practicable, in order to prevent delays at or immediately prior to trial."). "Where there is a legitimate concern for witness safety, a protective order of the sort requested by the Government will facilitate the valuable practice of early and expansive disclosure of 3500 material while reducing the danger of obstruction of justice." *Garcia*, 406 F. Supp. 2d at 306-307. The Court should do so here.

Similarly, the government is not required to provide application materials in support of search warrants unless the defense first files an affidavit of standing. "Where a defendant fails to file an affidavit of standing, he has no basis to request disclosure of the search warrant application or challenge the validity of the warrant." *United States v. Green*, 2025 WL 1127826, at *2–3 (W.D.N.Y. Mar. 13, 2025), *report and recommendation adopted*, 2025 WL 1125264 (W.D.N.Y. Apr. 16, 2025) (recommending the denial of defendant's motion for disclosure and motion to suppress be denied because "defendant has failed to submit a sworn statement demonstrating that he has an expectation of privacy in any of the items searched…"); *see also United States v. Cobb*, 544 F. Supp. 3d 310 (W.D.N.Y 2021); *United States v. Pirk*, 282 F. Supp. 3d 585 (W.D.N.Y. 2017) (holding that defendant, who neither owned, nor slept or stored personal belongings at, clubhouse lacked standing to challenge warrant for search of

clubhouse, and thus had no Fourth Amendment right of access to affidavit filed in support of warrant, absent showing that he had reasonable expectation of privacy in clubhouse.); *United States v. Wilson*, 2017 WL 1456984, at *7 (W.D.N.Y. Apr. 24, 2017) ("Further weighing against unsealing of the affidavit is the Court's finding … that defendants have not sufficiently established standing to challenge the searches….").  Courts have traditionally protected the identity of a confidential informant who provides information to law enforcement in order to "further [ ] and protect[ ] … the public interest in effective law enforcement." *Roviaro v. United States*, 353 U.S. 53, 59 (1957).  "The privilege recognizes the obligation of citizens to communicate their knowledge of the commission of crimes to law-enforcement officials and, by preserving their anonymity, encourages them to perform that obligation." *Id.*  "The purpose of this protection is to safeguard witnesses from possible reprisals, and thus, is consistent with the 'strong public interest in encouraging the free flow of information to law enforcement officers' used to justify secreting informants' identities." *United States v. Figueras*, 2009 WL 1364640, at *1 (W.D.N.Y. May 14, 2009) (citation omitted).

Notwithstanding the authorities above, the government seeks to produce search warrant application materials to the defense on an attorneys-eyes-only basis.  These applications may contain witness statements, descriptions of controlled purchases, law enforcement techniques, and case sensitive information – pleas, cooperators, case direction, etc.  These materials are not admissible evidence themselves and are only relevant for defense counsel to assess any potential Fourth Amendment claim.  It is thus not necessary or appropriate for the Defendant to have access to such sensitive information, especially where the government has no obligation to produce it at this stage of the litigation.

### 4.   Redactions are not a workable replacement for a protective order

Defense counsel's solution for the government is to redact all sensitive materials at this stage.  That is not workable or required.  "Requiring the Government to review and redact every file before production would severely strain the Government's resources and slow [the defendant's]access to materials he needs to prepare his defense. That process would be flatly 'inconsistent with rules requiring efficient and expeditious discovery.'" *United States v. Rowbottom*, 2024 WL 3104815, at *3 (D.D.C. June 24, 2024) (citation omitted).  Furthermore, if a counsel wants to share a specific document or information with the defendant from Protected Discovery Material Category 1, he or she can simply ask.  The government is open to practical solutions, including coming to an agreement on limited redactions and etc., redacted summaries, and is willing to accommodate reasonable requests.  If that fails, defense counsel retains the right to challenge a designation before this Court.

### 5.   Concerns with the Defendant

The government's proposed protective order is appropriate when viewed against the defendant's background and characteristics.  Multiple defendants in this case present real and substantive concern with unfettered access to case materials.

"The quintessential factor is whether a defendant will do what the court directs." *United States v. Barnett*, 2003 WL 22143710, at *12 (N.D.N.Y. Sept. 17, 2003) (in detention proceeding context).  "In other words, past behavior best predicts future behavior and whether the court can rely on a defendant's good faith promises." *Id.*

**Edward Leeper**

Leeper has an extensive criminal history which spans 28 years and 31 arrests. Leeper has 4 felony convictions and 12 misdemeanor convictions. Leeper's felony convictions include Attempted Strangulation 2nd-Obstruct Breath/Blood Circ-Cause Physical Injury (New York State Class E Felony), Criminal Sale Controlled Substance-5th Degree (New York State Class D Felony), Criminal Mischief 3rd: Damage Another Person's Property- Amount > $250 (Class E Felony), Attempted Robbery-3rd Degree (New York State Felony). Leeper has had 2 active orders of protection and 9 expired orders of protection. He has had 3 prior menacing arrests and 8 prior assault arrests. Leeper has had 3 Prior probation revocations and a re-arrest while on probation or on bail.

The defendant's own post-arrest interview shows dangerousness to cooperating witnesses in this case. On February 25, 2025, Leeper was interviewed by DEA TFO Christopher Szmania, HSI TFO Jake Stahley and JPD Detective Ronald Powers. Leeper was read his Miranda Warnings and waived his rights, agreed to speak to law enforcement. During the interview, Leeper stated that he did not work with Zaso in relation to narcotics nor did he take over Zaso narcotics operation when Zaso was most recently arrested. Leeper stated that Zaso would sometimes tell people that he was upset with that he would send Leeper after them. During the interview, Leeper stated that he is a "big trick" stating that if he had "anything to do with any illicit drugs at all, it would be to purchase pussy" and "if I had any illicit drugs, it was to pay for pussy that way". Leeper admitted that the females are drug addicted, sick because they are going through withdrawal and need of drugs. Leeper stated that he will pay the females with any drugs they wanted and in return they would have

19

sex with him.[2]  Leeper stated at times, he may also pay money to the females.  These events would take place at multiple locations including Leeper's residence.  Leeper stated that if he had any involvement with drugs, it would be "to purchase pussy" and admitted to having access to purchasing drugs to provide to the females.  At one point during the interview, Leeper started to become agitated and aggressive and asked what would happen to him he was to be physically aggressive towards TFO Stahley.  Leeper also stated that he is a "street enforcer" for anyone that needs him, and that people fear and respect him.

Furthermore, a cursory review of Leeper's Facebook returns show that he monitors cases and uses Facebook for storage and/or possible dissemination:

---

[2] The Second Circuit, and other circuit courts, have referenced the practice of providing, withholding, and threatening to withhold drugs as evidence of coercion to engage in commercial sex acts.  *See United States v. Shine*, 2022 WL 761520, at *2–*3 (2d Cir. Mar. 14, 2022) (noting that the defendant "exploited victims' ... withdrawal ... to compel them to engage in commercial sex acts when they otherwise would not have done so," and citing specific testimony from victims along those lines); *see also United States v. Wysinger*, 64 F.4th 207, 212 (4th Cir. 2023) (noting defendant did "not dispute that manipulating vulnerable women by exploiting their drug addictions in exchange for prostitution services can be coercion within the meaning of Section 1591" or "that withdrawal symptoms can be 'serious harm' within the statute's broad definition of that term").



CONFIDENTIAL INFORMANT BY MR. BENTLEY                    49

1      Q.   On those four dates, were you -- did you complete
2    controlled buys on an individual?

3      A.   Yes.

4      Q.   Do you remember who that individual was?

5      A.   Yes.

6      Q.   Who was it?

7      A.   Shawn Conway.

8      Q.   Could you tell the Grand Jury how you know Shawn
9    Conway?

10     A.   Through selling drugs.

11     Q.   How long have you known him?

12     A.   A little bit over a year probably.  It's been
13   close to two years now.

14     Q.   Other than these four dates, have you seen him in
15   person?

16     A.   Yes.

17     Q.   How often, do you know?

18     A.   Every day.

19     Q.   Every day for about a year?

20     A.   Yes.

21     Q.   When you work with the Task Force and complete a
22   controlled buy, do they usually go through a set list of
23   procedures with you?

24     A.   Yes.

25     Q.   Can you tell the Grand Jury what they do?

1    Q.  Was that inside the residence or outside the

2    residence?

3    A.  Inside.

4    Q.  Was there anyone else inside the residence at the

5    time?

6    A.  Yes.

7    Q.  Who was that?

8    A.  Kyle Linger and -- I'm trying to remember their

9    names.  A black man and white woman were there.  I'm

10   just at a blank with their names right now.  Her last

11   name was Briggs.  I can't remember.

12   Q.  Did any of those other people get involved in the

13   sale between you and Shawn Conway?

14   A.  No.

15   Q.  Okay.  What ultimately happened at 31 Cottage

16   Street on December 30th, 2021?

17   A.  I went in, went upstairs to his bedroom.  I

18   bought black tar heroin from him and left.

19   Q.  I'm sorry.  This room is awkward.  You're

20   answering my questions, but just make sure you're

21   speaking into the microphone.

22   After you bought that item from Shawn Conway, where

23   did you go?

24   A.  Back to the cemetery where we originally had met

25   with the Task Force.  I met them at the cemetery.

12:20

🔔 📍 5G 69% 

← **Philbrick, Richard A** ⤴



# Philbrick, Richard A

Powered by  **APPRISS** INSIGHTS

## Notify Me of Status Change

**Charges:**
Charge Code: PL 120.14 AM2
Charge Description: MENACING 2ND
Charge Date: Currently Unavailable
Bond Type: Currently Unavailable
Bond Amount: Currently Unavailable
Disposition Code: FOUND_GUILTY
Disposition Description: Guilty as charged - Misdemeanor

Charge Code: PL 220.16 01 BF3
Charge Description: CRIM POSS NARCO DRUG INT/SELL
Charge Date: Currently Unavailable
Bond Type: Currently Unavailable
Bond Amount: Currently Unavailable
Disposition Code: Currently Unavailable
Disposition Description: Currently Unavailable

← a ●━━━━━━━━ A 

|||    ○    ‹

**Andres Pizzaro Campos**

Andres Pizzaro Campos has felony convictions for Grand Theft: $300 less than $5,000 (Florida Felony); two convictions for Grand Theft in the 3rd Degree (Florida Felony); and one conviction for Petit Theft Merchandise Farm Transit while having 2 prior convictions (Florida Felony).  Andres Pizzaro Campos has had issues following direction in the past: three prior failures to appears, prior false personation, history of probation violation and revocations, arrests while under supervision, and a history of resisting arrest.

**Chauncy Robinson**

Chauncy Robinson has four felony convictions and one misdemeanor conviction. Robinson's New York State felony convictions include Attempted Criminal Possession of a Controlled Substance in the 3rd Degree: Narcotic Drug: Intent to Sell; Criminal Possession Controlled Substance/Narcotic; and two convictions for Criminal Sale Controlled Substance-3rd Degree Narcotic/Drug.

**Cindy Frank**

Cindy Frank is has had convictions for criminal possession of a controlled substance in the 3rd degree (New York States Class B Felony), false personation (New York State misdemeanor), and criminal possession of a controlled substance in the 7th degree (New York State misdemeanor).

**Jason Talley**

Jason Talley has an extensive criminal history beginning around 1994.  Talley has

felony convictions for Aggravated 2nd Degree: Intent to Cause Physical Injury with Weapon/Instrument (NY Felony); two convictions for Criminal Sale Controlled Substance-5th Degree (NY Felony); Criminal Possession Narcotic Drug-4th Degree (NY Felony); and Criminal Possession of a Controlled Substance – 3rd Degree: Narcotic Drug Intent to Sell (NY Felony). He has had bench warrants, revocation of his parole, and 2 active orders of protection.

Talley has been identified as associated with the Bloods gang. The government's proposed protective order is appropriate when viewed against Talley's background and characteristics including most notably, his gang afflation. *See generally* Margaret O'Malley, *Witness Intimidation in the Digital Age: Discovering Witness Intimidation*, Prosecutor 12, 18-19 (April-June 2015) ("In some states, discovery protective orders are routinely sought and granted, particularly in gang cases.") (describing California case against gang members in which "prosecutors sought and received extensive protective orders").

### C. Defendant-Max Pizzaro Campos's Request for A More Specified Definition Is Moot.

Defense counsel is correct "It is difficult without knowing more about how the government plans to apply its designations." Dkt. 71 at 3-4. At the time of filing, defense counsel did yet know the actual designations. Instead of having a further discussion with the government, defense counsel has chosen to file his objections. Furthermore, the levels of detailed required for defense counsel's requested is not practicable. The discovery in this case is voluminous. The current definitions provide a sufficient guidepost for defense. In its

disclosure, the government is providing an index of items which defense counsel can now access.

If applicable, the defendant will have access to their own statements (outside of controlled purchase recordings and statements found on others electronic devices and Facebook materials – they can access those materials but not retain in the community or in jail under Protected Discovery Material Category 2), criminal history work-ups, electronic devices and Facebook, and financial records (as long as third party information is not contained therein) as not protected discovery materials. These items will be unprotected as to each defendant and their attorneys. To the extent, defendant can still review all statements contained within others' materials such as Facebook accounts and electronic devices but not retain them. This is a reasonable protection.

Furthermore, if a counsel wants to share a specific document or information with the defendant from Protected Discovery Material Category 1, he or she can simply ask. The government is open to practical solutions – redactions, etc., and is willing to accommodate requests, if possible. If that fails, defense counsel may ask this Court to modify the protection of specific documents and information.

### D. Defendant-Max Pizzaro Campos's Request to Include Lay Persons and Family Members As Authorized Persons Misses The Mark.

Defense counsel appears to want to make members of Max Pizzaro Campos's family part of his legal defense team and moves to modify the definition of "Authorized Persons of the Defense Team". The district court in *United States v. McCaughey*, 534 F. Supp. 3d 132,

141 (D.D.C. 2021) dealt with this very issue.  The defendant in *McCaughey* challenged the proposed protective order's definition of "legal defense team" "because it does not include defense counsel's 'non-lawyer friends' or 'members of the defendant's family,'" and requested that "'laypeople assisting in the defense' be among the 'permitted viewers'" of the sensitive information.  *Id.* (citations omitted).  The district court rejected the defendant's argument. Agreeing with the government, "McCaughey's proposed definition would impermissibly broaden this definition so that it could apply to almost anyone.  Expanding access to the protected information in that way would render the protective order meaningless."  *Id.*  As the district court noted, "the defendant can always request a modification of the order or contest a sensitivity designation should it become necessary for counsel to show certain protected material" to friends or family.  *Id.*  The same applies here.  Allowing family members and other third parties access to sensitive exacerbates the very problem the government's protective order is trying to address.

**E.  Defendant-Jaquez Thomas's Request for Mere Redactions is not Workable.**

Defense counsel's initial request is for the government to merely redact personally identifying information from its discovery materials.  This request does nothing to address the government's concerns about its ongoing investigation and witness safety.  Furthermore, "[r]equiring the Government to review and redact every file before production would severely strain the Government's resources and slow [the defendant's] access to materials he needs to prepare his defense.  That process would be flatly 'inconsistent with rules requiring efficient and expeditious discovery.'" *United States v. Rowbottom*, 2024 WL 3104815, at *3 (D.D.C. June 24, 2024) (citation omitted).  Defendant-Thomas objects to paragraph 6 of the proposed

protective order. Dkt. 69 at 6. The defendant's objection is primarily based on his unworkable approach of redacting voluminous discovery and allowing defendants access to sensitive materials.

### F.  The Government Agrees to Modify Proposed Order Relating to Defendant-Thomas's Objection to Paragraph 4.

Defendant-Thomas objects to paragraph 4 of the proposed protective order. Dkt. 69 at 5. The government has no objection to defense counsel's proposed modification - adding "Authorized Persons of the Defense Team" to paragraph 4.

### G.  Defendant-Max Pizzaro Campos's and Jaquez Thomas's Request for an Exhaustive No-Contact List Circumvents the Purposes of the Protective Order.

Defendant-Thomas objects to paragraph 7 of the proposed protective order. Instead, defense counsel seeks a government witness list at the outset of the case.

Defendant-Max Pizzaro Campos argues that the government's proposed protective order is "too vague" because "the no-contact list is not exhaustive." Dkt. 71 at 9. As to the no-contact provision, the parties agree that defense counsel and/or investigators may contact the "no contact" list witnesses. The "no contact" is merely meant to assist defense counsel and the defendant in complying with the terms of this Protective Order. The no-contact is solely for the purpose to ensure that the defendant (not defense counsel or any Authorized Person) does not seek to influence, coerce or intimidate any cooperating person or relevant party. When the restrictions of the Protected Discovery Materials become modified or relaxed and names and the identities of cooperating individuals become available to the

Defendants, the terms of this Protective Order apply to those individuals with no further action by the government.  If a close family member or relative is listed, the defendant may contact said individual so long as the defendant does not seek to influence, coerce or intimidate that individual concerning this matter.  If there is issue on relating to a name on the no-contact, the parties will meet and confer and if no agreement, bring the matter to the attention of the Court.

"The Government has no general duty to disclose the identities of its witnesses before trial." *United States v. Toth*, 2022 WL 16837972, at *7 (W.D.N.Y. July 13, 2022), report and recommendation adopted, 2022 WL 16836568 (W.D.N.Y. Nov. 8, 2022) (citing *United States v. Bejasa*, 904 F.2d 137, 139 (2d Cir. 1990)).  "[T]he dangers inherent in the disclosure of the names of government witnesses in the context of a narcotics case have been considered to be quite serious." *United States v. Feola*, 651 F. Supp. 1068, 1138 (S.D.N.Y. 1987), aff'd, 875 F.2d 857 (2d Cir. 1989).  "Especially in narcotics cases, where the dangers of witness intimidation, subornation of perjury or actual injury to witnesses are great ... the defendant's request for a witness list should not be granted absent a particularized showing of need." *United States v. Taylor*, 707 F. Supp. 696, 703 (S.D.N.Y. 1989).  Defense counsel have not provided a reason why the government's witness list is needed now.  Indeed, production of an exhaustive list would circumvent the whole purpose of the proposed protective order.

### H. Defendants' Objection to The Acknowledgement of Authorized Persons Is Both Moot and Meritless.

After the discussion with the parties, the government is agreeing to remove that provision based on the understanding between the parties.  The government does not seek

defense strategy or tactics.  Any such claim has no basis in fact.  Inconvenience is not a 6th Amendment violation.  Requiring additional protections to deal with legitimate government concerns is reasonable and well within this Court's discretion.  If defense feels any such filing would infringe on the 6th Amendment, a reasonable accommodation is to file the document *ex parte* or to a firewalled attorney.

Attachment A for Authorized Person is not a novel concept.    "The protective order should also condition disclosure of the information to members of the defense team other than counsel of record by requiring the team member to execute a nondisclosure agreement. It is suggested that filing any disclosed information on the docket be under seal absent a court order allowing public filing."  *United States v. Cousin*, 2022 WL 314853, at *36 (D. Mass. Feb. 2, 2022).

This issue was directly addressed by the district court in *United States v. Smith*, 985 F. Supp. 2d 506, 544–45 (S.D.N.Y. 2013).  In *Smith*, defendants' just as here, were concerned "about having those who have assisted in the defense, and who will assist going forward, sign a memorandum certifying that they understand they are bound by the Protective Order."  *Id.* The district court found this concern was "insufficient to reject a protective order" and advised that "[t]his type of procedure regularly has been used in criminal cases and explicitly approved by courts."  *Id.* (citing as examples, *United States v. Carriles*, 654 F. Supp. 2d 557, 570 (W.D. Tex. 2009) (approving the memorandum process requested and adding a provision that "[i]f necessary to avoid disclosing trial strategy, Defendant may make such submission ex parte. This procedure addresses the Government's interests in preventing unwarranted disclosure of

protected materials while only minimally affecting Defendant's ability to prepare for trial."); *United States v. Lindh*, 198 F. Supp. 2d 739, 743-44 (E.D. Va. 2002) ("[T]he procedures adopted herein, including the requirement of ex parte submissions [of memoranda of understanding] by the defendant, are designed to minimize any burdens on defendant's Sixth Amendment right to prepare and present a full defense at trial"). Ultimately, the district court also noted that none of Defendants' objections justify rejection of a protective order in this case.

The government is open to defense counsel filing Attachment A *ex parte* if they believe it will reveal trial strategy or to a firewall attorney, if necessary. The use of firewall counsel has been found sufficient to protect Sixth Amendment rights. *See United States v. Yousef*, 327 F.3d 56 (2d Cir. 2003). The practice of using firewall counsel to protect various types of privilege, including the attorney-client privilege, is common among the district courts of the Second Circuit, as well. *See, e.g.*, *United States v. Winters*, 2006 WL 2789864, at *2 (S.D.N.Y. Sept. 27, 2006) ("In addition, the Government's proposed employment of a "wall Assistant" adequately protects the defendant's asserted privilege. In particular, the wall Assistant will not communicate any of the information learned through his document review to members of the prosecution team.") (internal citation omitted); *United States v. Grant*, 2004 WL 1171258, at *2-3 (S.D.N.Y. May 25, 2004).

The Second Circuit recently addressed a similar issue in *United States v. Guzman Loera*, 24 F.4th 144 (2d Cir. 2022), where the district court, in trial of former leader of Mexican drug trafficking organization, issued protective orders which prohibited, among other things, removal of "Protected Discovery" from the United States; which required court approval

before "Protected Discovery" could be shown to persons not part of defense counsel's team; and which required defense counsel to submit the names of such persons to firewall counsel separate from prosecuting attorneys. *See* Gov't Ex B. (examples of protective orders). The Second Circuit rejected the defendant's challenge to among other things, use of a provision that required defense counsel to submit the names of such persons to so-called firewall counsel. "These restrictions were well within the discretion of the District Court under Rule 16(d)(1) of the Federal Rules of Criminal Procedure … and no substantial prejudice, which is required to warrant relief, … has been shown." *Id.* at 155 (internal citations omitted).

## CONCLUSION

For the reasons stated above, the government respectfully requests the Court grant the government's motion for a protective order.

DATED:  Buffalo, New York, April 29, 2025.

MICHAEL DIGIACOMO
United States Attorney

BY:    s/JOSHUA A. VIOLANTI
Assistant United States Attorney
United States Attorney's Office
Western District of New York
138 Delaware Avenue
Buffalo, New York 14202
716/843-5864
Joshua.Violanti@usdoj.gov

32